**BRUNSWICK CORPORATION and Sherwood Medical Industries, Inc., Plaintiffs-Appellees,**

v.

**David S. SHERIDAN and National Catheter Corporation, Defendants-Appellants.**

**No. 541, Docket 76–7414.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1978.

Decided July 18, 1978.

---

John P. Arness, Washington, D. C. (Hogan & Hartson, David B. Lytle, and Harold E. Masback, III, Washington, D. C., of counsel), for defendants-appellants.

Watson B. Tucker, Washington, D.C., (Mayer, Brown & Platt, Washington, D. C., Theodore A. Livingston, Jr., Robert L. Stern and Erwin C. Heininger, Chicago, Ill., of counsel), for plaintiffs-appellees.

Before FRIENDLY and VAN GRAAF-EILAND, Circuit Judges, and DOOLING, District Judge.*

FRIENDLY, Circuit Judge:

Appellees sued in the District Court for the Northern District of New York to enforce a covenant in a settlement agreement made in May 1971 by which, among other things, appellants Sheridan and National Catheter Corporation agreed that for five

* Of the District Court for the Eastern District of New York, sitting by designation.

years they would not make, use, sell or otherwise deal in flexible tubing for medical use incorporating features or configuration of an x-ray or conductive line similar to the products manufactured by appellee Sherwood Medical Industries, Inc., as of February 1969. Federal jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332. Appellants defended on the ground that the covenant sued upon as construed by appellees was unenforceable because violative of the Federal Antitrust Laws; appellants also counterclaimed under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) alleging that under appellees' "improperly broad and expansive interpretation" of the covenant it constituted "a contract unreasonably in restraint of trade in violation of Section 1 of the Sherman Act". The basis of both the defense and the counterclaim was, as more fully set out in the counterclaim, that appellees conspired, in unreasonable restraint of trade, to misuse the covenant "to prevent defendants from competing with plaintiffs" in making and selling medical tubing. The counterclaim further charged that appellees had combined and conspired to threaten appellants' prospective customers, bringing about concerted refusals to deal with appellants, for the purpose of destroying appellants' business and restricting or preventing its competition with appellees. It was further charged that appellees were attempting to monopolize the development, manufacture, and sale of catheters and medical tubing in the United States and that as a direct and proximate consequence of appellees' activities appellants had sustained substantial injury to their business and property.

The case was tried to court and jury on the issues framed by the complaint and by the antitrust defense and counterclaim and by additional counterclaims. At the close of all the evidence the case was given to the jury on the complaint for damages and on a counterclaim for interference with contract. A verdict in favor of the plaintiffs-appellees was directed on the antitrust and two other counterclaims. The jury was unable to agree on a verdict and a mistrial was declared. On appellants' application, the district court certified that there was no just reason for delay in the entry of final judgment dismissing the three counterclaims and expressly directed the entry of final judgment to that effect.

The appeal relates to so much of the judgment then entered as dismissed the antitrust counterclaim. Appellees moved to dismiss the appeal on the ground that the dismissal of the counterclaim could not properly be certified for separate final judgment under Rule 54(b) of the Rules of Civil Procedure. A previous panel denied the motion without opinion. We called for additional briefs. Examination of these as well as of the briefs on the merits and the record requires fresh consideration of the question of the appealability of the dismissal of the antitrust counterclaim. As said in Moore, 1B Federal Practice ¶ 0.404[1], at 407:

> Since a lower federal court cannot by its law of the case bind a higher court having appellate jurisdiction over it, the only sensible thing for a lower federal court, including an intermediate appellate court, to do is to set itself right instead of inviting reversal above, when convinced that its law of the case is substantially erroneous.

See also *Higgins v. California Prune & Apricot Growers, Inc.,* 3 F.2d 896, 898 (2 Cir. 1924); *Cochran v. M & M Transp. Co.,* 110 F.2d 519, 521 (1 Cir. 1940). The principle stated in Moore and the cited cases is peculiarly applicable to a question of jurisdiction; it would be quite unseemly for a panel of a court of appeals to exercise jurisdiction because a prior panel had denied a motion to dismiss when the court believes it has none.

I

In and before 1959 appellant Sheridan devised and was making and selling plastic tubing for medical uses in various forms; he had obtained patents on some of the devices and had pending patent applications on others. Sheridan had formed, and conducted his manufacturing and selling activities through, Sheridan Catheter and Instru-

ment Corporation. Appellee Brunswick in 1959 and early 1960 negotiated with Sheridan three agreements under which it (a) bought all the stock of Sheridan Catheter, (b) became exclusive licensee of the Sheridan patents and applications listed in the agreement and (c) employed Sheridan as "head" of Sheridan Catheter for five years, and thereafter from year to year until 1974. At the time the agreements were made Sheridan Catheter had gross assets with a book value of about $128,000 and a book net worth of $95,442. Brunswick bought the stock at a premium of $99,400 over the book net worth by issuing to Sheridan and his wife Brunswick shares. The exclusive patent license was for the life of the latest issued patent but was terminable by Brunswick at the end of each five years; for the first five years the minimum royalty was $20,000 a year; the rate of royalty was 4% on the first half million dollars of sales, 3% on the next half million, and 2% on sales over a million dollars. The employment agreement provided Sheridan a salary of $22,500 a year and bound him to disclose to and help Brunswick obtain patents on all discoveries that he made or assisted in making along the lines of Sheridan Catheter's business or any line of business it or Brunswick was conducting. Sheridan agreed also that if he terminated the agreement before 1974 he would not infringe any of the patents licensed to Sheridan Catheter or Brunswick and he further agreed

". . . that he will not enter into or in any way take part in a business in competition with Catheter or Brunswick so long as any license agreement under the Sheridan patents remains in effect between Sheridan and Catheter or Brunswick."

In addition Sheridan agreed that during his employment by Sheridan Catheter or Brunswick he would not engage in any activities directly or through any other business unit competing with the business of Sheridan Catheter or Brunswick: this restriction was to bind Sheridan for five years

after 1974 if the employment agreement was not terminated by Sheridan Catheter or Brunswick before that date.

The arrangement apparently functioned well enough until 1967 when Sheridan found or thought that he was being pushed out of managerial control, and, in a sharp exchange of letters between Sheridan and Brunswick in September-October 1967, Sheridan took the position that Brunswick had disaffirmed the employment contract, was in breach of the contract in relegating Sheridan to spearheading product development, and left Sheridan no alternative but to conclude that Brunswick had terminated his employment contract. After ending his employment with Brunswick, Sheridan formed appellant National Catheter Corporation, and he re-entered the field of making plastic tubing for medical uses.

Early in 1968 Brunswick and Sherwood Medical Industries, Inc.,[1] sued Sheridan and National Catheter in the United States District Court for the Northern District of New York for (1) a declaratory judgment that Brunswick had performed its obligations under the employment agreement and that Sheridan had terminated the agreement and was bound by the post-termination provisions of it; (2) an injunction compelling Sheridan and National Catheter to disclose and transfer to Brunswick all Sheridan's discoveries and know-how covered by the employment agreement made after February 1960 and forbidding Sheridan and National Catheter from using or disclosing to anyone other than Brunswick or Sherwood any technical know-how or other trade secrets relating to the business, inventions, improvements, secret processes and formulas; (3) an injunction against the use of trade secrets and confidential information gained by Sheridan while he was working for Brunswick and against interfering with Brunswick's catheter products business or enticing away its employees and customers; and (4) for a declaration that the license agreement (on which over $415,-

---

1. Sherwood Medical Industries, Inc., was, late in 1967, organized by Brunswick, which had merged Sheridan into itself late in 1960, to take over the business of the Brunswick "Health and Science Division."

000 in royalties had allegedly been paid) continued in full force, and an injunction against any interference by threats or otherwise with Brunswick or its customers on the basis of alleged infringement of the licensed patents.

Answering, Sheridan and National Catheter asserted in substance that the three 1960 contracts constituted a single master contract,[2] that Brunswick breached it by reducing Sheridan's managerial status, and that the breach terminated all aspects of the master contract. Among the affirmative defenses pleaded were a plea that Brunswick's claims were barred by public policy considerations, and a plea that the "noncompete agreement" was unenforceable and unreasonable because unlimited in time, area and circumstance and too broad to be given legal effect. Four counterclaims were pleaded. The first asserted that the entire contract had been terminated and that Sheridan was entitled to his salary until February 1969; the second alleged that Brunswick had terminated the contract and therefore could not claim any rights under the license and asked money damages and an injunction against the alleged infringement of the Sheridan patents; the third demanded damages for Brunswick's alleged interference with Sheridan's reestablishing himself in business; and the fourth sought compensation for Brunswick's use as a parking lot of a tract of Sheridan's land.

On May 28, 1971, a settlement agreement was entered into by Brunswick and Sherwood on the one side and Sheridan and National Catheter on the other. The agreement provided for dismissing all claims in the lawsuit with prejudice; the parties recognized the validity of the License Agreement and agreed that it should continue in effect; the Employment Agreement was "considered terminated as of October 9, 1967," and as of that date Sheridan was released from his duty under the Employment Agreement to disclose and transfer to Brunswick his inventions and improvements, from his duty not to publish or disclose technical know-how relating to inventions and improvements made during Sheridan's employment with Brunswick, from his agreement not to compete with Brunswick while employed and thereafter until February 19, 1979, from his agreement (if he terminated the Employment Agreement before 1974) not to infringe any patents owned by or licensed by Sheridan to Brunswick, and from his agreement not to compete with Brunswick so long as the License Agreement was in effect. The Settlement Agreement provided further that Sheridan and National Catheter would not infringe any claim of any unexpired patent covered by the License Agreement or issued upon an application for a patent on any invention that Sheridan had conceived, alone or with others, while he was with Brunswick. The Settlement Agreement then provided that for a period of five years neither Sheridan nor National Catheter would

> "(a) manufacture, or have manufactured, disposable needles, metal cannulae or hypodermic syringes and component parts thereof; or
>
> (b) manufacture, have manufactured, use, sell or otherwise deal in flexible tubing made by any process in which the wall thickness of the tubing or the inner and/or outer diameters of the tubing is/are controlled so as to incorporate the features or configuration of an integral bubble or funnel similar to those manufactured by Sherwood as of February 1969, *or incorporating features or configuration of an x-ray or conductive line similar to the products manufactured by Sherwood as of February 1969.*"

(The language italicized is that ultimately in issue.) The Settlement Agreement provided further that Sheridan would not disclose trade secrets learned while working for Brunswick, would cooperate on certain pending patent matters including prosecution of two specific patent applications, that certain patent applications filed by Sheri-

---

**2.** Paragraphs 7.3 and 7.4 of the stock purchase agreement of February 1960 made execution of the license agreement and employment agreement conditions precedent to the obligation of the selling shareholders to consummate the stock purchase agreement.

dan and by Sheridan and Isaac Jackson, a former employee of Sherwood then employed by National Catheter, contained no Brunswick trade secrets, and that Sheridan and National Catheter would cancel three claims of one specific patent application. Sherwood agreed to pay Sheridan $100,000 "as additional consideration," and to pay over all royalties that had been held in trust during the litigation.

The controversy arising out of the settlement agreement centered on conductive tubing made by appellees of a kind indicated in Sheridan's 1962 patent, No. 3,070,-132 and conductive tubing made by National Catheter of the kind covered by Jackson patent No. 3,580,983, issued May 25, 1971 (three days preceding the date of the settlement agreement). Both tubings are intended to reduce the risk of electrostatic spark discharge during surgical and other treatment procedures conducted in an atmosphere that may contain combustible anesthetizing agents. Frictional contact between dialectric tubing [usually polymeric] and fabrics such as cotton, nylon, etc., is a source of electrostatic sparking. For antiseptic reasons disposable tubing is preferred. Both parties' tubing employs a conductive [3] "line" running the length of the dialectric plastic tubing and connectable to a ground. Appellees' line could be either conductive strips fused to the interior and exterior surfaces of the tubing or a conductive strip fused in the tube wall and extending from the inner to the outer surface. (The Sheridan 1962 patent noted as an "additional discovery" that satisfactory non-sparking quality required an electrically conductive strip on the interior as well as the exterior wall of the tubing.) The conductive tubing of the 1971 Jackson patent comprised a dialectric plastic tube and an elongated electrically conductive filament member secured to the exterior of the tubular member; the patent visualized use of fully conductive connectors, and that portions of the filament member could be separated from the tubular member without loss of conductivity.

The trial was protracted—thirteen witnesses were called and deposition testimony of three additional witnesses was read to the jury. While much of the testimony was apparently directed to informing the jury about the importance of conductive tubing in surgical procedures, the mode of producing it, and certain principles of patent law and procedure, there was evidence directed to defining the differences in construction and utility between the two types of conductive line tubing, and evidence of the sales of conductive line tubing allegedly lost by Brunswick to National Catheter and of the sales allegedly lost to National Catheter through Brunswick's informing American Hospital Supply Corporation, a principal customer of National Catheter, of the terms of the 1971 Settlement Agreement restricting National Catheter's right to sell conductive tubing similar to Brunswick's.

Some trial testimony bore on the parties' intentions in using the language of paragraph 5 of the Settlement Agreement, restricting the right of Sheridan and National Catheter to make conductive line tubing "similar" to that made by Sherwood in February 1969. There was no evidence of discussion specifically directed to types of conductive line tubing; in May 1971 National Catheter was not making any conductive line tubing. There was evidence, however, that Sheridan knew when he signed the Settlement Agreement that the claims of the Jackson patent had been allowed, and knew that the patent would shortly issue, if he had not learned that it had already issued. He considered that "our tube was different, period", and that, having the Jackson patent, he could comfortably sign the Settlement Agreement without telling Brunswick that National Catheter planned to market the Jackson type tubing. Sheridan testified that he would not have signed the Settlement Agreement if he had known that Brunswick would complain about National Catheter's making a product based on the Jackson patent, and that he did not

---

**3.** Under both the 1962 and the 1971 patents the conductive strip is preferably of the same plas-

tic base material as the tubing but compounded with a finely divided conductive material.

know whether Brunswick would have signed the Settlement Agreement if it had known National Catheter's plan. It was implicit that Brunswick supposed it had acquired from Sheridan an "exclusive" as against him on three products, one of which was "conductive line tubing".

Directly on the issue of "similarity", appellants sought to show that their tubing was non-infringing, readily distinguishable by its "piggy back" construction, and fitted with electrically superior conductive connectors at each end, and did not leak at the points where two segments were joined. Appellees produced an expert who testified that the electrical conductivity of the two tubings was about the same, that the basic tubing in each was a clear plastic and the conductive portion was black, that both behaved the same way in electrostatic testing, that they had equivalent flexibility, and that both had conductive connectors, appellees' being a widened or flared portion integral to the tubing, appellants', a separately made black piece fastened at the ends of the tubing, shaped with flare and taper. The evidence was that two segments of appellees' tubing, if connected so that the black conductive lines are in contact, are conductive, but if the black lines do not touch, there is no conductive path from one segment to the other except when, as when the tube is in use, there is a conductive path from one black line through the fluid content of the tubing to the second black line.[4] In appellees' tubing the black stripe goes all the way through the tubing wall (as seen in Figure 2 of the Sheridan patent); in appellants' tubing the black stripe is wholly outside the tubing (as seen in Figure 1 of the Jackson patent). It appears that the evidence was not sufficient to enable the jury to resolve the issue whether appellants' tub-

ing was "similar" to that manufactured by appellees as of February 1969.

## II

The argument of Sheridan and National Catheter, made at the close of the case, was essentially that the Settlement Agreement, if interpreted to exclude Sheridan and his company from making and selling the Jackson type tubing, imposed a restraint that, on the evidence, the jury could find unreasonable, cf. *Compton v. Metal Products, Inc.,* 453 F.2d 38, 45 (4 Cir. 1971), or inherently monopolistic, and that, apart from the contract, considered as itself a restraint, there was a combination or conspiracy between Brunswick and Sherwood to exclude the competition of Sheridan and National Catheter, cf. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Brunswick argued that the restriction in the Settlement Agreement was not an illicit effort to extend the monopoly of the patent, but was a reasonable non-competition term in a Settlement Agreement related to the sale of a business and its know-how, and thus a valid ancillary restraint. The district judge granted the motion to dismiss the antitrust counterclaim, observing that, in the light of *Bradford v. New York Times Co.,* 501 F.2d 51, 58 (2 Cir. 1974), the five year covenant, limited in scope, for which Sheridan received $100,000, could not be found unfair or an unreasonable restraint violative of the Sherman Act; he noted that there was no evidence of a combination or conspiracy to monopolize or otherwise violate the antitrust laws; the court distinguished *Compton v. Metal Products, Inc., supra,* on the ground that the covenant there ran for twenty years and was broad in scope; and the court noted that the Settlement Agree-

---

4. The 1973 National Fire Protection Association Standard for the Use of Inhalation Anesthetics (NFPA No. 56A, par. 4642) reads:

    4642. Tubing and connectors used for suctioning shall provide a continuous electrically conductive pathway to the vacuum bottle and to the vacuum outlet. The materials used shall be conductive throughout, or where it is necessary for visual monitoring may be of antistatic material with antistatic

    properties good for the specified life of the material provided they embody a continuous integral conductive pathway designed so that in normal use the conductive pathway shall make and maintain conductive contact with conducting materials. Electric resistance of such tubing and connectors shall be not greater than one megohm when tested as specified in 465.

ment contained separate agreements not to infringe and not to deal in certain designated types of flexible tubing and catheters, indicating that the latter restraint functioned independently of the patent license.

The district court gave to the jury the appellees' claim for breach of contract and appellants' counterclaim for interference with the contractual relation between appellant National Catheter and American Hospital Supply Corporation. The issue of the reasonableness of the covenant not to make the particular tubing was given to the jury, but the antitrust defense was not. While appellants, arguably, related their requests to charge on antitrust issues to their counterclaim, the requests were applicable to the antitrust defense as well. The charge to the jury did not refer to antitrust concepts, but did present to the jury the question of the reasonableness of the contractual restraint under state common law, cf. *Bradford v. New York Times Co., supra,* 501 F.2d at 57–59.

The jury was unable to agree and a mistrial was accordingly declared.

Appellants moved the district court to enter final judgment on the antitrust counterclaim pursuant to Rule 54(b). No reference was made to the antitrust defense, but court and counsel dealt in substantive antitrust terms that necessarily embraced the affirmative defense as well as the counterclaim. The district court, in a careful memorandum,[5] granted the motion on the grounds, *first,* that final dismissal of the counterclaim would assure the simplification of what would otherwise be an overly complex retrial, and, if the dismissal was held erroneous, would avoid a third trial; *second,* that, although the complaint and the antitrust counterclaim were diverse claims, they arose out of a common nucleus of facts; if, after a retrial of the claims submitted to the jury, it were found on appeal that the antitrust counterclaim should not have been dismissed, a third trial would be required at which much of the evidence would have to be repeated; and, *third,* since the counterclaim was dismissed

not only because there was no evidence of combination, conspiracy and intention to restrain trade, but also on the ground that no court applying the rule of reason has ever held an employee covenant not to compete violative of Section 1 of the Sherman Act (*Bradford v. New York Times Co., supra,* at 59), and that *Compton v. Metal Products, Inc., supra,* was not controlling, the appeal from the judgment would involve largely issues of law. Judge Foley noted that his dismissal of the counterclaim

".  .  .  if affirmed will assure that the case may again go to trial with less foreboding on the part of the trial judge that there are issues previously decided that might rise again, and if reversed will allow the entire action to be tried again as a unit with full appeal of all issues to follow. See *Gas-A-Car, Inc. v. American Petrofina, Inc.,* 484 F.2d 1102 (10th Cir. 1973)."

Neither the Rule 54(b) order nor the notice of appeal referred to the antitrust defense, but the appeal from the antitrust counterclaim presents for review the substantive antitrust issues that court and counsel in the court below rightly, if with undesirable informality, treated as dispositive alike of the affirmative defense and of the counterclaim.

### III

To satisfy the requirements of Rule 54(b) a judgment must have the degree of finality required for appealability under 28 U.S.C. § 1291, and the claim adjudicated must be a "claim for relief" separable from and independent of the remaining claims in the case. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 435–436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956); *Gottesman v. General Motors Corp.,* 401 F.2d 510 (2 Cir. 1968); *Gas-A-Car, Inc. v. American Petrofina, Inc., supra,* 484 F.2d at 1104–1105. These technical requirements of the Rule were sufficiently met here. The counterclaim, being one for damages and not simply a defense to the action, existed independently of the

---

5.  See *Gumer v. Shearson, Hammill & Co.,* 516 F.2d 283, 286 (2 Cir. 1974).

appellees' suit for breach of the Settlement Agreement and was dismissed on the merits after trial. See *Western Geophysical Company of America v. Bolt Associates, Inc.*, (Western Geophysical II), 463 F.2d 101, 103 n. 2 (2 Cir.), *cert. denied*, 409 U.S. 1040, 93 S.Ct. 523, 34 L.Ed.2d 489 (1972), and authorities there cited.

■ This, however, is not sufficient. The Rule also requires that the district judge make

"an express determination that there is no just reason for delay"

before directing entry of final judgment on the separate claim. It has long been settled that the district court's determination is not conclusive, but is reviewable by the court of appeals for abuse of discretion, *Sears, Roebuck & Co. v. Mackey, supra*, 351 U.S. at 437, 76 S.Ct. 895. In our view the district judge did so abuse his discretion and this court is consequently without jurisdiction to entertain the appeal. *Allis-Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360, 362–63 (3 Cir. 1975). See *Cold Metal Process Co. v. United Engineering & Foundry Co.*, 351 U.S. 445, 452, 76 S.Ct. 904, 100 L.Ed. 1311 (1956).

■ This court has indicated on numerous occasions that entry of final judgment under Rule 54(b) is not to be done lightly, particularly when the action remains pending as to all parties. We have strongly approved the view expressed in *Panichella v. Pennsylvania Railroad Co.*, 252 F.2d 452, 455 (3 Cir. 1958): ". . . 54(b) orders should not be entered routinely or as a courtesy or accommodation to counsel. The power which this Rule confers upon the trial judge should be used only 'in the infrequent harsh case' . . .", quoted in *Luckenbach Steamship Co. v. Muehlstein & Co.*, 280 F.2d 755, 758 (2 Cir. 1960); *Campbell v. Westmoreland Farm, Inc.*, 403 F.2d 939, 942 (2 Cir. 1968); and *Arlinghaus v. Ritenour*, 543 F.2d 461, 463–64 (2 Cir. 1976). This view reflects a more general policy disfavoring piecemeal appeals, see *Arlinghaus, supra*, 543 F.2d at 464 ("The district court has an independent duty to avoid piecemeal appeals . . ."); *Luckenbach,*

*supra*, 280 F.2d at 759, which the Supreme Court has recently reiterated albeit in another context. *United States v. MacDonald*, —— U.S. ——, ——, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978). To prevent the "waste and futility" generated by piecemeal appeals like this one, *Luckenbach, supra*, 280 F.2d at 759, we have held that "there must be some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Western Geophysical Co. v. Bolt Associates, Inc., supra*, 463 F.2d at 103, *quoting Campbell v. Westmoreland Farm, Inc., supra*, 403 F.2d at 942.

■ In this case the primary claim and the antitrust counterclaim were inextricably interrelated, and the appellants' affirmative antitrust defense to the main claim is largely the same as their antitrust counterclaim. By entertaining the appeal from dismissal of the antitrust counterclaim, we in effect would grant defendants an appeal from the judge's failure to charge their antitrust defense. Moreover, the counterclaim itself ultimately depended on the interpretation of the contract clause on which the claim rested. If the clause were to be construed narrowly, dismissal of the antitrust counterclaim would be proper but the contract claim itself might well fall. *Per contra* if the clause were to be construed broadly, the contract claim would be sustainable as such but the antitrust defense and counterclaim might prevail. The parties agree that construction of this ambiguous clause, taking account of the extrinsic evidence, was a question for the jury in the first trial and will be a question for a jury in the second. Restatement of Contracts 2d § 238(2) and comment e (Tent. Draft No. 5, March 31, 1970). Since the first jury was unable to agree and we cannot predict what a second jury will say, any opinion we could now write on the antitrust counterclaim would be hypothetical and advisory. Where the multiple claims at issue in a 54(b) determination are as closely intertwined as they are here, this court and a district court in this circuit have held that final judgment under Rule 54(b) should not be entered. *Western Geophysical Co. v. Bolt Associates,*

*Inc., supra; Gaetano Marzotto & Figli, S.P.A. v. G.A. Vedovi & Co.*, 28 F.R.D. 320, 324 (S.D.N.Y.1961).

Indeed, *Western Geophysical* is almost on all fours with the case at bar. At issue there was a licensing agreement under which Bolt gave Geophysical the exclusive right to use certain pneumatic acoustical repeater devices as well as an option on a second exclusive license covering "any improvements, designs, or developments and inventions relating to" such devices. *Western Geophysical I*, 440 F.2d 765, 767 (2 Cir. 1971). Geophysical sued Bolt for alleged breach of the agreement. Bolt's answer included affirmative defenses and counterclaims based on asserted antitrust violations, including the allegation that Geophysical's actions constituted an attempt to monopolize and a combination and conspiracy in restraint of trade. *Id.* On appeal the question was whether it was an abuse of discretion to enter final judgment under Rule 54(b) with respect to the dismissal of the counterclaims while Geophysical's main claim remained pending.[6] This court found that it was. We held that "Bolt's antitrust defenses and counterclaims were inextricably intertwined" with its other defenses to the main claim, that Geophysical's "claims and Bolt's counterclaims are so closely related that piecemeal appeals are inappropriate," and that the saving of the expense of a possibly unnecessary determination of damages was not a sufficient basis for the required finding that there was "no just reason for delay", *Western Geophysical II*, 463 F.2d at 103.

The present case makes manifest the soundness of the *Western Geophysical* rule against entering final judgment with respect to one of multiple "inextricably intertwined" claims. First, as noted above, we cannot pass on the counterclaim until the contract has been construed. The claim under § 1 of the Sherman Act stands very differently if the agreement covered only

slightly more than devices infringing the Sheridan patent than if it created a wider zone of protection. If this were sufficiently wide, the agreement could constitute a violation of § 1 without proof of the involvement of additional parties (or of intra-enterprise conspiracy), whereas if the agreement is narrowly construed participation by additional parties might be necessary to establish the antitrust allegation. Thus, this is a case where, in the language of *Western Geophysical II, supra*, 463 F.2d at 104, "this court could not pass intelligently on the propriety of the dismissal of the counterclaim . . . without considering [the] contract claim and the defenses to it . . . ." The necessarily hypothetical nature of such an opinion is the clearest proof of the wisdom of the statement in *Cott Beverage Corp. v. Canada Dry Ginger Ale*, 243 F.2d 795, 796 (2 Cir. 1957), that "[w]e cannot decide the issues intelligently piecemeal and, if we so attempt, are sure to find ourselves uttering pious generalities only which will come back to plague us later." Save for the exceptions in 28 U.S.C. § 1292, the function assigned us by Congress is to decide appeals from judgments that are truly final, not to advise the district judges of the legal consequences of differing determinations of fact which have not yet been made by a jury.

Moreover, this is a case where a decision on the pending claim could moot most of the appealed counterclaim issues. Appellants do not contend, indeed, could not contend, that paragraph 5 of the Settlement Agreement produces a challengeable restraint of trade unless it is interpreted to apply to such tubing as appellants' conductive line tubing made under the Jackson patent. That depended on whether the rival tubings were "similar" to each other, and that issue remains undecided. Hence, a finding by the jury that the Settlement Agreement did not extend to appellants' "piggy back" tubing would make unnecessary the extensive analysis of the validity

---

**6.** The district judge had entered a judgment in favor of Geophysical both dismissing the counterclaims and upholding its main claim. Because the judge failed to determine Geophysical's damages, however, this court found the decision as to the main claim nonappealable. This left the question whether the certification of the counterclaim alone was still proper.

of agreements of this type that would now be required.[7] Such a possibility of mootness "in itself is a distinct argument of substantial weight supporting the normal postponement of review until the entire case shall be decided," *Panichella v. Pennsylvania Railroad Co., supra,* 252 F.2d at 455.

So far as authority is concerned, we can readily dismiss cases where decision on the appealed claim in no way turned on the result of the pending claim, so that on any resolution of the pending claim the court's determination of the appealed issue would stand and did not have to be made in the alternative. For example, in *SCM Corp. v. Radio Corporation of America,* 407 F.2d 166, 170 (2 Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969), whatever the outcome of the plaintiff's pending claims dealing with patent validity, the court found that defendant's antitrust counterclaim would fail because the injury alleged was not one "which gives it standing to sue" under the antitrust laws. See also *Gaetano Marzotto, supra,* 28 F.R.D. at 324–25 (distinguishing *Omark Industries, Inc. v. Lubanko Tool Co.,* 266 F.2d 540 (2 Cir. 1959)). See generally *International Terminal Operating Co. v. Waterman SS Co.,* 272 F.2d 15 (2 Cir. 1959), *cert. denied,* 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); *Bendix Aviation Corp. v. Glass,* 195 F.2d 267, 272 (3 Cir. 1952); *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 71 F.R.D. 341 (E.D.Wash.1976); *Cold Metal Process Co. v. United Engineering & Foundry Co., supra,* 351 U.S. 445, 76 S.Ct. 904, 100 L.Ed. 1311; *Landon v. Lief Hoegh & Co.,* 521 F.2d 756 (2 Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *Allis-Chalmers Corp. v. Philadelphia Electric Co., supra,* 521 F.2d 360. The pertinent cases are those involving multiple claims as closely interrelated as those here; there this court has dismissed appeals for abuse of discretion in the

54(b) determination. See *Campbell v. Westmoreland Farm, Inc., supra,* 403 F.2d 939; *Western Geophysical Co. v. Bolt Associates, Inc., supra,* 463 F.2d 101.

The policy against piecemeal appeals of intertwined claims should not be subverted by the specters of additional trials summoned up by the able district judge. With all respect, these ghosts are of the judge's own making. All that is needed is for him to submit all the issues to the jury, take a verdict, and if the antitrust issues have not been mooted and he is still so inclined, grant judgment to the plaintiffs notwithstanding any verdict in favor of the defendants on the antitrust defense and counterclaim. This has been widely recognized as the preferred procedure. See *Malone & Hogan Hospital Foundation v. Boston Ins. Co.,* 378 F.2d 362 (5 Cir. 1967); *Klein v. District of Columbia,* 133 U.S.App.D.C. 129, 132, 409 F.2d 164, 167 n.3 (1969); *Phoenix Sav. & Loan Assn. v. Aetna Casualty & Sur. Co.,* 427 F.2d 862, 873–74 (4 Cir. 1970); *Passwaters v. General Motors Corp.,* 454 F.2d 1270, 1272–73 (8 Cir. 1972). The failure of the district judge to use this well-known procedure on the first trial, a failure that he might well not repeat on a second, is no excuse for our relaxing the final judgment rule. Still better, the distraction of the jury by possibly irrelevant issues can be avoided by trying the issue of interpretation first, or in a trial of all the issues, submitting it to the jury first. Despite our lack of appellate jurisdiction, we can properly bring these possibilities to the attention of the district court. Cf. *Acha v. Beame,* 570 F.2d 57, 64 (2 Cir. 1978). There are thus no significant affirmative factors to weigh against the policies counseling rejection of this essentially interlocutory appeal and the extensive consideration of important antitrust issues that may prove to be academic which entertaining it would require.

---

**7.** Appellants contend that, whatever the meaning of the contract, appellees used it to prevent sale of their tubing. This was the gravamen of Count II of the counterclaim, on which the judge did not direct a verdict but on which the

jury disagreed, and of Counts III and IV on which appellants have not pursued their appeal. (Brief, p. 2, n. 2). Our concern here is with the antitrust counterclaim.

The appeal is dismissed for lack of jurisdiction. No costs.

DOOLING, J., dissents without opinion.