**TELECOM INTERNATIONAL AMERICA, LTD.,**
Plaintiff,

v.

**AT & T CORP., Defendant.**

**AT & T Corp., Counterclaim–Plaintiff,**

v.

**Telecom International America, Ltd. and Telecom International Co., Ltd., Counterclaim–Defendants.**

**AT & T Credit Corporation, Third–Party Plaintiff,**

v.

**Telecom International America, Ltd., Third–Party Defendant.**

**Telecom International America, Ltd., Fourth–Party Plaintiff,**

v.

**AT & T Corp., Fourth–Party Defendant.**

No. CIV. 96–1366(AKH).

United States District Court, S.D. New York.

June 14, 1999.

Jeffrey S. Lipkin, Stanley & Fisher, P.C., New York City, for Third-Party Plaintiff AT & T Credit Corp.

Aurora Cassirer, Jaime Weiss, New York City, for Third-Party Defendant Telecom International America, Ltd.

Alan M. Unger, Elizabeth M. Sacksteder, Sidley & Austin, New York City, for Defendant AT & T Corp.

## AMENDED MEMORANDUM AND ORDER GRANTING RULE 54(B) MOTION

HELLERSTEIN, District Judge.

Pursuant to agreements dated April 27, 1994 and June 22,1995, Telecom International America, Ltd. ("TIA") agreed to purchase, and AT & T Corp. ("AT & T") agreed to manufacture and sell, enumerated items of telecommunications equipment. TIA proposed by its purchases, and pursuant to a contract tariff order for the purchase of AT & T telephone services, executed on April 29, 1994, to provide international "800" telephone service to subscribers in Japan at rates lower than the international rates offered by Japanese telephone companies. TIA expected that it could, through the network services and telephone equipment it was purchasing from AT & T, route its subscribers' international calls from Japan, through specialized switching devices in the United States, maintained at an AT & T site in Staten Island, New York, to reach destined parties in other parts of the world. TIA anticipated that the equipment it was purchasing from AT & T would be used in a call-turnaround application which would enable it to pair a type of inbound "800" call to a dedicated switchboard in the United States, with a second outbound call from the United States, to reach the party dialed by the Japanese subscriber, without visible affect to the quality of telephone service. Callers from Japan could thus bypass the international service provided by Japanese carriers, and choose TIA's lower rates, premised in turn on volume purchase commitments under AT & T's tariff rates.

TIA sought financing of the purchase price for the equipment, and AT & T Credit Corporation ("AT & T Credit"), recommended to TIA by AT & T, agreed to provide such financing, secured by a lease of the equipment purchased by TIA from AT & T.[1] In connection with the lease, TIA and AT & T Credit executed two Master Equipment Lease Agreements ("MELAs") on September 23, 1994 and January 17, 1996, providing secured financing for purchase prices of

---

1. At the time of execution of the financing agreements, AT & T Credit was a subsidiary of AT & T. AT & T divested itself of AT & T Credit in October 1996 and, effective September 1, 1998, AT & T Credit changed its corporate name to Newcourt Communications Finance Corporation.

$527,916.17 and $452,000.84, respectively.[2] The MELAs provided for monthly payments by TIA to AT & T Credit over a term of thirty-six months, subject to an acceleration clause that could make the entire financing sum due and payable immediately following default and notice. The MELAs also provided that AT & T Credit's rights to accelerate and obtain repayment of TIA's loan obligation upon default were to be unaffected by any breaches or frustrations suffered by TIA pursuant to its contracts or relationships with AT & T.

From its inception, TIA encountered numerous performance problems with the equipment and telephone services it purchased from AT & T, and remained largely dissatisfied despite substantial efforts by AT & T to make repairs and modifications. Because of such frustrations in its expectations, TIA failed to produce the requisite minimum volume of telephone service, as prescribed by the tariff filed by AT & T, and incurred shortfall penalties pursuant to that tariff. TIA demanded return of the purchase price it had paid to AT & T and its damages, and stopped payment to AT & T Credit under the MELAs. AT & T Credit responded by accelerating the entire unpaid balance. This complex lawsuit followed.

TIA filed suit against AT & T, claiming that AT & T breached on "overarching agreement" to design and implement from "end-to-end" a call-turnaround application, and the equipment contracts and the contract tariff order that were its constituent elements. TIA claimed damages in excess of $187 million. TIA also alleged fraud, claiming to be entitled to punitive damages and attorneys' fees, and promissory estoppel, unfair competition, and violations of the Communications Act of 1934, 47 U.S.C. §§ 201–203.

AT & T counterclaimed against TIA and TIA's parent, Telecom International Co., Ltd., to recover $59 million of unpaid tariff rates for services, shortfall penalties prescribed by the tariff and unpaid charges for maintenance and repair of the equipment purchased by TIA.

AT & T Credit then intervened, and filed a third-party complaint against TIA seeking recovery of the accelerated debt, late charges and attorneys' fees in the aggregate amount of $645,580.30, less $103,077.22 recovered from the sale of the recovered equipment, or a net of $542,503.08.[3] TIA denied liability, and brought a fourth-party action against AT & T, claiming fraudulent inducement to contract to purchase the equipment and, essentially, indemnity of any obligation owed to AT & T Credit.

After substantial discovery, AT & T and AT & T Credit moved for summary judgment. AT & T moved to dismiss the complaint and for judgment on its counterclaims. AT & T Credit moved for judgment under the MELAs. I heard argument on March 18, 1999 and, after the parties answered interrogatories I had addressed to them, again on April 26, 1999. AT & T's summary judgment motion is *sub judice*. I granted AT & T Credit's motion during the argument held on March 18, 1999, and I now certify that summary judgment as final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

I ruled during argument on March 18, 1999 that AT & T Credit is entitled to judgment because TIA had accepted the equipment, executed commencement certificates unequivocally stating its unconditional obligation to AT & T Credit in accordance with the terms of the MELAs, and had agreed under the MELAs that its obligations of repayment of the financing extended by AT & T Credit were independent of any defenses or breaches under TIA's contracts with AT & T. (Transcript of Oral Argument, held March 18, 1999, at pp. 119–22). Under New Jersey law, the law governing the MELAs, AT & T

---

2. These amounts reflect the final adjusted purchase prices for the equipment.

3. Pursuant to the terms of the MELAs, the Lessee agreed to pay a late charge of five percent of any rental payment that was not paid within 10 days of its due date, and attorneys' fees in the event of litigation. The late charges of $2,055,68 and $1,978.84 under each agreement and attorneys' fees of $27,288.97 are included in the total amount sought by AT & T Credit. (Affidavit of Michael E. White ("White Aff.") dated July 31, 1997, Ex. G).

Credit was thus entitled to judgment. I reserved judgment as to the amount, but the parties have agreed subsequently that the total amount due AT & T Credit, including attorneys' fees incurred with regard to this motion totals $645,580.30. Thus, AT & T Credit, after the foreclosure credit noted above, is entitled to judgment against TIA in the amount of $542,503.08.

In short, I find there is no just reason to delay AT & T Credit's right to enforce its judgment. This is so under applicable law, the terms of the MELAs and the strong commercial policy relevant to equipment lease financing.

### Principles Applicable to Rule 54(b) Certification

A court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties, as to a claim, counterclaim, cross-claim, or third-party claim, upon an express determination, or certification, that there is "no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b) (West 1999); *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). A "reasoned, even if brief, explanation of the basis for the court's determination that there is no just reason for delay" is required. *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 86 (2d Cir.1998). Certification should not be lightly given; it should not be given when claims are "inextricably interrelated" or "inherently inseparable," *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1095 (2d Cir.1992); it is appropriate when claims are "separable from and independent of the unresolved claims." *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. 1460; *L.B. Foster*, 138 F.3d at 86.

Certification of finality is appropriate here. The MELAs are financing leases, governed by the Uniform Commercial Code in effect in New Jersey, separate and independent of any controversy arising from the underlying sales transactions between AT & T and TIA.

### The Equipment Leases Give Rise to Separate and Independent Issues

The MELAs, entered into and governing the relationship between AT & T Credit and TIA, specifically provide that they are separate and independent of the relationship between TIA and AT & T, and that TIA's obligations to AT & T Credit under the MELAs are not to be affected by any issue between TIA and AT & T. Thus, the MELAs provide, in bold-faced capital letters:

> LESSOR SHALL NOT BE BOUND BY, OR LIABLE FOR, ANY REPRESENTATION OR PROMISE MADE BY SELLER (EVEN IF LESSOR IS AFFILIATED WITH SELLER) ...

(White Aff., Ex. A., at ¶ 15). The same paragraph of the agreement goes on to provide that the equipment lessor, that is, AT & T Credit, shall have "No liability to lessee, lessee's customers, or any third parties for any direct, indirect, special or consequential damages arising out of this agreement or any schedule or concerning any equipment." (*Id.*). And, finally, by signing the MELAs and by the continuation of this bold-faced, capitalized clause, TIA agreed that it could not look to AT & T Credit for relief because of its claims against AT & T; it could "Look solely to seller [that is, only to AT & T] for any and all claims and warranties relating to the equipment." The clause in full provides:

> IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT: (A) LESSOR [AT & T CREDIT] SHALL NOT BE DEEMED TO HAVE MADE ANY REPRESENTATION, WARRANTY OR PROMISE MADE BY SELLER [AT & T], NEITHER SELLER NOR LESSOR SHALL ACT AS, OR BE DEEMED TO BE, AN AGENT OF THE OTHER, AND LESSOR SHALL NOT BE BOUND BY, OR LIABLE FOR, ANY REPRESENTATION OR PROMISE MADE BY SELLER (EVEN IF LESSOR IS AFFILIATED WITH SELLER) .... IT IS FURTHER AGREED THAT LESSOR SHALL HAVE NO LIABILITY TO LESSEE, LESSEE'S CUSTOMERS, OR ANY THIRD PARTIES FOR ANY DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY SCHEDULE OR CONCERNING ANY EQUIPMENT ... PROVIDED, HOWEVER, THAT NOTHING IN THIS

AGREEMENT SHALL DEPRIVE LESSEE OF ANY RIGHTS IT MAY HAVE AGAINST ANY PERSON OTHER THAN LESSOR. LESSEE SHALL LOOK SOLELY TO SELLER FOR ANY AND ALL CLAIMS AND WARRANTIES RELATING TO THE EQUIPMENT.

(*Id.*).[4]

TIA argues that AT & T recommended AT & T Credit to be the source of financing to facilitate TIA's purchase of the equipment from AT & T, that AT & T Credit was influenced to continue to provide financing because of the importance and size of the transaction to AT & T (Affidavit of Eamon Joyce, Nov. 19, 1998, Ex. E), and that, generally, there was a close relationship between the two companies creating a dependent, rather than an independent, relationship. The MELAs, however, provide specifically that the affiliation between AT & T and AT & T Credit is irrelevant. The clause quoted above provides clearly that AT & T Credit "shall not be deemed to have made any representation made by Seller," nor shall either "be deemed to be an agent of the other," nor "be bound by, or liable for, any representation or promise made by" the other, "even if Lessor [AT & T Credit] is affiliated with Seller [AT & T]." TIA has failed to offer any proof that the corporate separateness of the two companies was not observed, or that the officers and employees of the two acted interchangeably, or that the corporate veil should otherwise be pierced. *Lyon v. Barrett*, 89 N.J. 294, 300, 445 A.2d 1153 (1982); *AYR Composition, Inc. v. Rosenberg*, 261 N.J.Super. 495, 505, 619 A.2d 592, 597 (1993). TIA accepted financing from AT & T Credit agreeing to such independence and the unavailability of defenses against AT & T Credit, and fails to offer any proof to rebut the clear intention of its financing agreements.

Thus, TIA cannot embroil AT & T Credit into its disputes with AT & T. AT & T Credit's claims arising from violation of the terms of the MELAs are "separable from and independent of" the unresolved claims between TIA and AT & T and, thus, the action by AT & T Credit against TIA is "separable from and independent of" the issues and claims in the lawsuit between AT & T and TIA. *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. 1460; *L.B. Foster*, 138 F.3d at 86.

■ TIA also argues, notwithstanding the express terms of the MELAs, that its fourth-party action against AT & T is related to AT & T Credit's action because if AT & T is found liable for fraudulently inducing TIA to accept the terms of the MELAs, TIA would be indemnified by AT & T, and the damage award in favor of TIA could pay the judgment in favor of AT & T Credit. This is not sufficient "relatedness" to deny a certification that is otherwise merited. As the Second Circuit noted in *Ginett*, "there is always an underlying interrelatedness of the claims between the parties in a multiparty civil action." *Ginett*, 962 F.2d at 1095–96. Such "interrelatedness," sufficient to justify joinder of parties and claims under the liberal rules of Rule 20(a) of the Federal Rules of Civil Procedure, "cannot, in itself, 'inextricably intertwine' the claims" to prevent a Rule 54(b) certification.

> When we review the district court's decision to "dispatch" (citation omitted), a finally-decided claim or claims for appeal, we need to keep in mind, of course, that there is a continuum between "interrelated" and "inextricably intertwined." There is always an underlying interrelatedness of the claims between the parties in a multiparty civil action; rule 20(a) permits joinder only if the asserted claims for relief by and/or against the various parties are "in respect of or arising out of the same transaction, occurrence, or series of transactions

---

4. Other courts have routinely upheld the validity of such restrictive clauses. *See AT & T Credit Corp. v. Zurich Data Corp.*, 37 F.Supp.2d 367, 371–72 (D.N.J.1999); *Siemens Credit Corp. v. Newlands*, 905 F.Supp. 757, 763 (N.D.Ca.1994) ("In fact, the Lease disclosed, in capital letters, that plaintiff disclaimed all express and implied warranties and that defendants would be required to rely solely on the warranties given by the vendor."); *cf. AT & T Credit Corp. v. Transglobal Telecom Alliance, Inc.*, 966 F.Supp. 299, 303–04 (D.N.J.1997) (lessor warranty and disclaimer clauses upheld as part of valid finance lease, but district court refused to certify final judgment).

and occurrences and if any question of law or fact common to all [plaintiffs or defendants] will arise in the action." However, this interrelatedness cannot, in itself, "inextricably intertwine" the claims as to preclude appellate review; otherwise every multiparty case (and virtually every multiclaim case) would elude the entry of rule 54(b), and rule 54(b) would be meaningless. *Id.* TIA's fourth-party complaint does not allege fraud or misrepresentation by AT & T Credit. If TIA recovers damages from AT & T, or if AT & T recovers damages from TIA, the rights and liabilities arising from the MELAs between AT & T Credit and TIA would not be affected. Nor, conversely, would a decision in favor of AT & T Credit affect the rights and liabilities in the TIA and AT & T action. In sum, AT & T Credit's action against TIA is not "inextricably interrelated" or "intertwined" with TIA's action against AT & T.

Thus, AT & T Credit should have the opportunity to enforce its judgment expeditiously. TIA remains free to pursue its independent actions against AT & T, including its fourth-party claim against AT & T. Since the separate claims are independent, there is no possibility of piecemeal appeals. As Judge Friendly ruled in *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir.1978), the claims are not "inextricably intertwined" because an appeal in one action—here, by TIA from the judgment in favor of AT & T Credit—would not have to reach the merits of the claims in the other action, those of the TIA and AT & T actions, or render any opinion in those actions advisory or moot. The issues are independent; those relating to AT & T Credit involve the enforceability of the express terms of a commonly used equipment financing agreement that specifically provides for independence and severability; those involving TIA and AT & T involve entirely separate issues arising from the Communications Act of 1934, the filed-tariff (or filed-rate) doctrine, the applicability of product warranties in an express contract, the course of dealings between TIA and AT & T, and the like. In short, the issues are different.

### The Commercial Policy Favoring Separability

The MELAs are finance leases, created to facilitate acquisition of expensive equipment, and to protect and secure lenders against the risks associated with such acquisitions, *see* N.J.S.A. 12A:2A–103(g) (West 1999). Severability between the financing transaction and the sales transaction is crucial, even where the financing entity is affiliated with the manufacturer. Otherwise, non-consumer finance leases would become tied to the sales transaction, and no equipment lessor could confidently expect prompt payment in the event of a dispute, for it would become an easy matter for a debtor to suspend payments by merely raising an issue about the fitness of the equipment it purchased. Thus, the New Jersey Uniform Commercial Code provides:

(1) In the case of a finance lease that is not a consumer lease the lessee's promise under the lease becomes irrevocable and independent upon the lessee's acceptance of the goods.

N.J.S.A. 12A:2A–407 (West 1999). Finance leases, as one commentator has stated, are "functionally the equivalent of an extension of credit." Huddleston, *Old Wine in New Bottles: UCC Article 2A–Leases*, 39 Ala. L.Rev. 615, 660 (1988); *see* N.J.S.A. 12A:2A–103, Comment (g) (West 1999). The "normal expectations of the parties" to a finance lease are unique to the financing and purchasers recognize that the finance lessors are "really lending money and dealing largely in paper rather than goods." 2 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 13–3 (4th ed.1995). If equipment finance lessors cannot enforce and collect debts until the termination of lawsuits between manufacturer/sellers and purchasers, equipment lessors likely will be deterred from entering into finance transactions, or they will express the increased risks in higher interest and fee rates. Ultimately, purchasers will be hurt and commerce will be affected.

### Conclusion

There is no just reason to delay AT & T Credit's ability to enforce its judgment

498

against TIA. Under applicable law, the terms and conditions of the MELAs and sound reasons of policy, this certification of finality pursuant to Rule 54(b) of the Federal Rules of Civil Procedure is appropriate, and is consistent with sound judicial administration. The Clerk is directed to enter final judgment in favor of AT & T Credit and against TIA in the amount of $542,503.08.[5]

---

5. Shanley & Fisher, P.C., counsel for AT & T Credit, may release to AT & T Credit the sum of $103,077.22 (the net sales proceeds from the disposition of the subject equipment) to be credited to the account of TIA. AT & T Credit is not entitled to fees regarding any "future enforcement or execution proceeding" related to this judgment, either under the terms of the MELAs, or any other statutory provision.