**Frank J. GINETT, Plaintiff–Appellee, Cross–Appellant,**

**v.**

**COMPUTER TASK GROUP, INC., Defendant–Appellant, Cross–Appellee.**

**No. 844, Dockets 91–7768, 91–7792.**

United States Court of Appeals, Second Circuit.

Argued Jan. 28, 1992.

Final Submissions Jan. 31, 1992.

Decided April 21, 1992.

---

Robert E. Knoer, Buffalo, N.Y. (Marcus, Knoer & Crawford, of counsel), for plaintiff-appellee, cross-appellant.

H. Kenneth Schroeder, Jr., Buffalo, N.Y. (Joseph G. Makowski, Hodgson, Russ, Andrews, Woods & Goodyear, of counsel), for defendant-appellant, cross-appellee.

Before: TIMBERS, WINTER, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendant Computer Task Group, Inc. (CTG) appeals from a partial final judgment entered pursuant to Fed.R.Civ.P. 54(b) in the United States District Court for the Western District of New York, John T. Elfvin, Judge, awarding plaintiff Frank J. Ginett $138,320 on his claim for severance pay. We conclude that we have jurisdiction to entertain CTG's appeal and, on the merits, we affirm in part, reverse in part, and remand the matter to the district court for further proceedings.

## I. FACTS AND BACKGROUND

Ginett was hired by CTG in 1985 as manager of its newly-created Corporate Projects Office (CPO), which was designed, *inter alia*, to acquire lucrative, long-term corporate contracts. CTG fired him on November 28, 1988, ostensibly for unsatisfactory job performance. The composition and basis of Ginett's compensation during this period was the subject of a series of agreements.

### A. *The 1985 employment agreement.*

The first agreement, entitled "COMPUTER TASK GROUP EMPLOYMENT AGREEMENT", was effective from Ginett's first day of employment at CTG. It had no expiration date. This agreement included, *inter alia,*

1. A "compensation plan", effective until December 31, 1986, which provided that Ginett would receive $78,000 in total compensation "at 100% performance".

2. A "guide for future compensation", which entitled Ginett to 4% of that portion of the CPO's gross profit which exceeded 30% of CTG's lowest revenue projections.

3. A paragraph labeled "General Terms and Conditions", which included a covenant not to compete and a nondisclosure provision.

4. A recitation that as consideration for Ginett's agreement, CTG agreed to pay Ginett, in the event of severance, "an amount equal to the sum of compensation (including incentive or commission compensation) earned by [Ginett] from Computer Task Group during the prior calendar month immediately preceding the month in which termination occurs."

### B. *The 1987 compensation plan.*

On March 23, 1987, Stephen P. Keider, CTG's senior vice president, sent a memorandum to Ginett which began: "As we agreed at our meeting today, your compensation plan for 1987, effective January 1, 1987 will be composed of several components". The described components included an annual base salary of $72,000; a bonus of $2,000 per quarter conditioned on the attainment of certain objectives; a car allowance of $450 per month; and certain other incentives, including an "incentive component" of 5% of the CPO's gross margin, "calculated year to date and paid monthly".

### C. *The 1987 deals.*

In 1987, Ginett's efforts began to bear fruit for CTG. After protracted negotiations, Ginett landed a series of long-term contracts with USS–POSCO Industries, Inc. (UPI) that provided for $27.6 million in revenues, and an estimated profit of $9.1 million for CTG. Additionally, Ginett successfully negotiated a contract with Geneva Steel with projected revenues of over $10 million. His incentive compensation under the 1987 compensation plan, on the UPI deal alone, would have amounted to approximately $455,400. Ginett never received this incentive compensation. He did, however, receive effusive praise from his superiors for the UPI deal, and the board of directors voted Ginett a stock option of 5000 shares, "[i]n recognition of your contribution to the accomplishments of the firm during 1987, and as an incentive/reward for future performance".

### D. *The 1988–92 compensation plan.*

On March 17, 1988, Ginett sent a memo to Keider which began: "Per our discussions, the following is the basis for my compensation effective January 1, 1988 thru [*sic*] December 31, 1992." This memo, which was endorsed "Frank, I agree. S.P. Keider", included this language:

My compensation is composed of the following:

1) Base Salary is $96,000 per annum.
2) Deferred Incentive Compensation of $80,000 per annum subject to the following conditions:
   • Amount to be paid to a third party insurer under provisions acceptable to all three parties.
3) Other incentive for over or under achievement of annual margin targets identified below.

The deferred incentive compensation portion is to be paid quarterly, as long as I am employed by CTG.

(underscoring in original). According to Ginett, the "deferred incentive compensation" portion of this agreement was "a mechanism for deferring receipt of those [455,400] incentive dollars [from the UPI deal] to later years for income tax purposes."

The 1988–92 compensation plan also included the following three paragraphs:

If, during this five year period, Frank Ginett is terminated by Computer Task Group, he will be paid four month's [*sic*] severance, based upon the average of the last three months['] total compensation. (i.e. Ginett shall receive 1.33 times the prior quarter['s] total compensation).

\* \* \* \* \* \*

Ginett will sign a new non-compete agreement as part of this agreement. CTG and Ginett shall execute required agreements between themselves and third parties to effect the deferred incentive plan.

Ginett never signed a "new non-compete agreement". In fact, no such agreement was ever prepared and presented to him for signature.

### E. *The deferred compensation agreement.*

On August 15, 1988, CTG and Ginett executed the deferred compensation agreement contemplated by the 1988–92 compensation plan. This agreement recited that CTG, "in order to enhance the compensation paid to [Ginett], wishes to provide him with deferred compensation payable in the event of his retirement or other termination of employment with the Company" and further provided that CTG would "contribute to a trust established for the benefit of" Ginett. The first contribution, in the amount of $80,000, was to be made on November 1, 1988; further contributions, each in the amount of $40,000, were to be made on January 1 and July 1 of 1989, 1990, 1991, and 1992.

The deferred compensation agreement also contained a section 1.02, entitled "Cessation of Contributions", which recited that on the occurrence of any of four enumerated events (Ginett's permanent disability; his death; the liquidation, dissolution or winding up of CTG; or January 1, 1996), or in the event of the termination of Ginett's employment, CTG would immediately be

relieved of any obligation to make further contributions to the trust. This section also contained a proviso which read: "Notwithstanding the foregoing, the Company agrees that this Section 1.02 shall not be construed to terminate [Ginett's] right to receive any compensation which may be due him by the Company pursuant to any written compensation plan in effect between the Company and [Ginett] as of the date of termination of employment." Ginett maintains that this section 1.02 was the subject of some negotiation; to this end, he submitted to the district court a copy of a prior draft of this trust agreement, which provided for the cessation of contributions only upon the occurrence of the first four events enumerated above, but *not* upon his termination. Ginett also maintains that when CTG expressed its wish to add termination as one of the events which would relieve CTG from its duty to make contributions, he demanded that the "Notwithstanding the foregoing" term be inserted in order to protect his right to the $455,400 in incentive compensation which he claims to have forfeited in exchange for the deferred incentive plan.

### F. *The events of November 1988.*

On November 3, 1988, CTG's President and Chief Operating Officer, John P. Courtney, wrote a letter to Ginett, which purported to reduce to writing an October 31, 1988 discussion between the two. This letter stated (1) that CTG was "prepared to honor its present obligations" under the deferred compensation agreement (that same day, CTG sent a check for the initial $80,000 contribution to the First Southern Trust Company); (2) that CTG desired "to amend the funding formula" of the deferred compensation plan by tying future payment obligations directly to Ginett's "attainment of revenue targets and profit margins as set in your annual compensation plan", *i.e.*, "that CTG's future payment obligations under the Deferred Compensation Plan will be directly related to earned incentives"; and (3) that CTG was prepared to increase Ginett's base compensation to $100,000 for the year 1989. The letter ended with a line for Ginett to sign and

date, indicating that the terms of the letter were "understood and accepted this ____ day of November, 1988." Courtney included a stamped, self-addressed envelope for Ginett to return a signed copy.

Ginett did not sign and return the Courtney letter. Instead, on November 14, 1988, he sent Courtney a letter of his own, indicating that the November 3 letter was "not consistent with my understanding of the incentive compensation agreements which I currently have with CTG." Ginett indicated that his understanding was that the deferred compensation agreement was executed in lieu of the incentive monies earned from the UPI deal. Ginett added: "To suggest that those obligations should be reduced, or that CTG be released from its commitments at this point after the new business has been generated, seems to me to be an unfair and unreasonable request."

On November 28, 1988, Courtney wrote Ginett another letter, informing him "that effective immediately Computer Task Group is terminating your employment." According to this letter, CTG decided to terminate Ginett "based upon the unsatisfactory financial and operational performance of the Corporate Projects Office this year as well as the anticipated poor performance next year". The letter also referred to Ginett's "failure to address certain issues outlined in our meeting on October 31". Courtney also noted that Ginett had recently submitted a business plan for the CPO which was "totally unsatisfactory" and which required a significant change in management direction. To date CTG has paid Ginett no severance pay, and has ceased making contributions to the deferred compensation trust.

### G. *The complaint.*

On December 15, 1989, Ginett filed a three-count complaint against CTG in the United States District Court for the Western District of New York. Count I alleged that his discharge was in violation of CTG's written and oral policies, thereby constituting a breach of contract and wrongful discharge under New York law. Count II alleged that CTG had violated express

agreements with Ginett by failing to pay (a) deferred incentive compensation, (b) severance pay, and (c) other related benefits. Count III alleged that CTG had violated 18 U.S.C. § 1962 (civil RICO) and injured him as a result thereof. The case was assigned to Judge Elfvin.

### H. *The first summary judgment motion.*

CTG moved for summary judgment on each of the counts; Ginett cross-moved for partial summary judgment on his claim for severance pay. On January 17, 1991, Judge Elfvin issued a memorandum and order in which he denied CTG's motions for summary judgment on counts I and II, but granted CTG's motion for summary judgment dismissing the civil RICO count. Although Judge Elfvin indicated that he was "inclined to grant Ginett's cross-motion— largely because of CTG's failure to oppose it", he nevertheless denied it, "without prejudice", because of the inconsistency between the 1985–86 agreement, which provided for one month's compensation as severance, and the 1988–92 compensation plan, which provided for 1.33 times the prior quarter's total compensation as severance.

### I. *The second summary judgment motion.*

Ginett again moved for partial summary judgment on his severance pay claim; CTG again cross-moved for partial summary judgment. Ginett's motion sought to remedy the prior inconsistency by showing the court that the 1988–92 compensation plan had superseded the 1985–86 agreement; thus, he argued, severance pay was controlled by the latter agreement. CTG did not dispute this contention; however, it argued that since Ginett had never signed a new non-compete agreement, the severance pay provision of the 1988–92 compensation plan was unsupported by consideration and was therefore unenforceable. CTG also argued that Ginett's promise to sign a new noncompete agreement was an unfulfilled condition precedent to the 1988–92 compensation plan, which rendered that entire agreement a nullity. Finally, CTG argued that, should the district court find the severance pay clause enforceable, Ginett should receive only $32,000 in severance pay, and not the $138,320 which he had claimed. This final argument was based on affidavit evidence of the negotiations leading up to the 1988–92 compensation plan, which, CTG said, showed that the parties contemplated a calculation of severance pay based only on Ginett's base compensation and incentive compensation, and did not include Ginett's deferred compensation.

### J. *The decision appealed from.*

In a memorandum and order filed on July 10, 1991, the district court rejected these arguments, denied CTG's motion for partial summary judgment, and granted Ginett's motion for partial summary judgment on his claim for severance pay, in the amount of $138,320. Ginett, in his affidavit, had arrived at this amount by adding $24,000, representing his base salary for the three-month period prior to his termination, to $80,000, representing the deferred incentive compensation paid on November 3, 1988, and multiplying the resulting $104,000 by 1.33. The district court accepted this calculation without analysis.

The district court also held that there was no failure of consideration for the 1988–92 compensation plan, because the defendant had provided his services to CTG, and further noted that the requirement that Ginett sign a new non-compete agreement was "merely additional." The court was similarly unpersuaded that Ginett's failure to sign a new non-compete agreement constituted an unfulfilled condition precedent. Further, the court concluded, "total compensation", on which Ginett's severance pay was based, was an unambiguous term that precluded consideration of the extrinsic evidence of prior negotiations offered by CTG. Although the memorandum and order directed the clerk to enter partial final judgment, *see* Fed.R.Civ.P. 54(b), no such judgment was entered at that time.

On July 19, 1991, Ginett moved the district court to amend its decision by adding prejudgment interest. *See* Fed.R.Civ.P. 59.

While this motion was *sub judice*, CTG and Ginett filed notices of appeal and cross-appeal, respectively. Since a rule 59 motion was pending, we dismissed the appeals. *See* Fed.R.App.P. 4(a)(4). On August 29, 1991, the district court granted Ginett's request for prejudgment interest, allowing it from December 1, 1988.

#### K. *Rule 54(b) certification.*

On September 25, 1991, at the request of both parties, Judge Elfvin directed the clerk to enter final judgment on Ginett's severance pay claim only. *See* Fed. R.Civ.P. 54(b). He also issued a four-page memorandum entitled "FEDERAL RULES OF CIVIL PROCEDURE RULE 54(b) CERTIFICATION", which stated that there was "no just reason for delaying entry of final judgment" on Ginett's severance pay claim, and justified the entry of final judgment as follows:

(1) The severance pay claim was an "ultimate disposition of an individual claim entered in the course of a multiple claim action";

(2) "There is no reason to expect that an Appellate Court would have to look at the issues involved in the question of plaintiff's claim for severance on a second occasion if the determination is appealed at this time";

(3) The severance pay claim is severable from the rest of the complaint, as the issues are separate and distinct from other issues presented by the litigation;

(4) It would work an undue hardship on Ginett were he to have to await receipt of his severance pay until the remaining issues of the case are determined; and

(5) Should the summary judgment on the severance pay claim be reversed for trial, most of the same witnesses would be called to testify on the issue of severance as on the other issues presented by the complaint.

Although Ginett is nominally a cross-appellant in this action, only CTG reinstated its appeal after the disposition of the rule 59 motion. From the rule 54(b) judgment entered on September 26, 1991, CTG appeals.

### II. APPELLATE JURISDICTION

On appeal CTG mounts several challenges to the award of $138,320 in severance pay plus prejudgment interest. Before we may reach the merits of the appeal, however, we must consider the matter of our own jurisdiction, an issue not raised by either party.

Judge Elfvin entered a final judgment as to Ginett's severance pay claim only; other claims in the case still await resolution. Initially, therefore, we must determine whether Judge Elfvin acted within his discretion under rule 54(b) in directing the entry of final judgment on Ginett's severance pay claim. We conclude that he did.

■ "We give the Federal Rules of Civil Procedure their plain meaning, and generally with them as with a statute, '[w]hen we find the terms * * * unambiguous, judicial inquiry is complete.'" *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989) (citations omitted). Rule 54(b), which applies only when multiple claims or multiple parties are involved in the lawsuit, provides that the district court

> may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Thus, to have a final judgment under the rule, (1) multiple *claims* or multiple *parties* must be present, (2) at least one claim, or the rights and liabilities of at least one party, must be finally decided within the meaning of 28 U.S.C. § 1291, and (3) the district court must make "an express determination that there is no just reason for delay" and expressly direct the clerk to enter judgment.

Factors (1) and (2) address the issue of whether rule 54(b) applies at all to the circumstances of the case. 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*

§ 2655 (2d ed. 1983) (Wright, Miller & Kane). Thus, they are questions of law, and are reviewed *de novo*. Factor (3), on the other hand, is addressed to the ultimate decision to direct the entry of judgment; given the permissive nature of rule 54(b) ("*may* direct the entry of a final judgment"), this decision "is left to the sound judicial discretion of the district court" and "is to be exercised 'in the interest of sound judicial administration.'" *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956)).

So that we may effectively review the district court's exercise of discretion under the rule, we have suggested that it provide "a brief reasoned statement in support of its determination that 'there is no just reason for delay' * * * where the justification for the certificate is not apparent." *Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283, 286 (2d Cir.1974) (Timbers, J.). This requirement is not, however, jurisdictional, as we will proceed to the merits if the reasons for entering partial final judgment are "obvious". *See, e.g., Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 419 (2d Cir.1989). If the question of whether judgment should have been entered is a close one, we will honor the district court's exercise of its discretion if it "will make possible a more expeditious and just result for all parties." *Gumer*, 516 F.2d at 286. For us to conclude that the district court's discretion was abused its decision must be "clearly unreasonable". *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. at 1466; *Cullen v. Margiotta*, 811 F.2d 698, 711 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

### A. *Multiplicity of claims.*

We have no doubt that the first factor is present in this case. Ginett has asserted multiple claims for relief against CTG, one of which—his claim for severance pay—is the subject of this appeal.

### B. *A claim "finally decided".*

Rule 54(b) is not an exception to the final judgment rule that generally governs federal appeals, for each claim or set of claims certified for appeal must still be "finally decided" within the meaning of § 1291. *Sears, Roebuck*, 351 U.S. at 435, 76 S.Ct. at 899. This finality is essential to our jurisdiction, for congress has commanded us, using the power granted to it by article III, that we "*shall* have jurisdiction of appeals from all final decisions of the district courts". 28 U.S.C. § 1291 (emphasis added). Unlike the discretionary jurisdiction conferred upon us by 28 U.S.C. § 1292(b), or the *certiorari* jurisdiction conferred upon the Supreme Court by 28 U.S.C. §§ 1254 *et seq.*, we have no choice in the matter when an appellant presents us with a "final decision" and a judgment entered thereon.

If the decision "ends the litigation [of that claim] on the merits and leaves nothing for the court to do but execute the judgment" entered on that claim, then the decision is final. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). Here, we are presented with a resolution of Ginett's severance pay claim which—absent this appeal—would be enforceable by a writ of execution. The decision on the severance pay claim is, therefore, final.

### C. *Abuse of discretion in finding "no just reason for delay".*

The abuse-of-discretion standard calls on a reviewing court, "in a spirit of humility occasioned by not having participated in what has gone before, not just to scrutinize the conclusion but to examine with care and respect the process that led up to it." *Founding Church of Scientology of Washington, D.C., Inc. v. Webster*, 802 F.2d 1448, 1457 (D.C.Cir.1986), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). "[T]he proper role of the court of appeals is not to reweigh the equities or reassess the facts but to make sure that the conclusions derived from those weigh-

ings and assessments are juridically sound and supported by the record." *Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. at 1466. We are to view the district court's decision to dispatch a claim for appeal through the prism of "sound judicial administration." *Id.; Sears, Roebuck,* 351 U.S. at 437, 76 S.Ct. at 900; *Perez v. Ortiz,* 849 F.2d 793, 796 (2d Cir.1988). The essence of discretion is deference; we probe the "brief, reasoned statement" which directs the entry of judgment, and presume it to be correct unless (1) it is "clearly unreasonable", *Cullen v. Margiotta,* 811 F.2d at 711—*i.e.,* the entry of judgment could nowise be said to further the interest of sound judicial administration—or (2) it is based on a clearly-erroneous finding that undermines the ultimate conclusion. Otherwise, we defer to the sound judgment of the district court, which "must daily grapple with managing a crowded civil docket". *Perez,* 849 F.2d at 796.

Since federal policy generally disfavors "piecemeal" appellate litigation, *see, e.g., Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. at 1466; *Brunswick Corp. v. Sheridan,* 582 F.2d 175, 183 (2d Cir.1978) (Friendly, J.), it might seem counterintuitive that a judgment could dispose of one claim out of many yet still be appealable. Although it would always be in the best "efficiency" interests of the court of appeals to allow but one appeal from each "civil action", rule 54(b) expressly contemplates the entry of "partial" final judgments, leaving the decision to "finalize" the judgment to the broad discretion of the district court, not of the court of appeals. *Compare* Fed. R.Civ.P. 54(b) *with* 28 U.S.C. § 1292(b) (granting the court of appeals discretion to hear appeals of "controlling question[s] of law"). In federal practice, there are sound reasons for such a rule.

Prior to 1938, the courts of appeals adhered to the common law's "single judicial unit theory" of finality. 10 Wright, Miller & Kane § 2653. *See, e.g., Metcalf's Case,* 77 Eng.Rep. 1193 (1615) ("the whole record ought to be either in the Common Pleas or in the King's Bench"). In practice, this meant that only one appeal was permitted from any one action—a sufficient rule for an era when most lawsuits involved two parties and one claim for relief. In 1938, however, the adoption of the Federal Rules of Civil Procedure changed the face of federal litigation; these rules presuppose that multiple claims and multiple parties may be joined in one "civil action". Indeed, the rules now encourage the liberal joinder of multiple claims and remedies in one complaint. *See* Fed.R.Civ.P. 13, 14, 18, 19, 20, 21, 22, 23, 23.1, 23.2, *and* 24. *See also* Fed.R.Civ.P. 42. Most recently, the new concept of supplemental jurisdiction, *see* 28 U.S.C. § 1367, allows for the joinder of even more parties and claims.

Under the federal rules, then, a single civil action can involve multiple claims against multiple parties, where prior to 1938, multiple actions would have been necessary. While liberal joinder avoids duplication of time and effort in the district court, it also tends to increase the length and complexity of civil actions. Retaining the rigid "single judicial unit theory" of appealability would have created a serious danger of hardship and denial of justice through delay if each claim had to await the determination of all claims as to all parties before a final judgment could be entered. *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950). Thus, rule 54(b) was incorporated as part of the original federal rules in 1938, with the hope of easing this harshness. *See generally Audi Vision Inc. v. RCA Mfg. Co.,* 136 F.2d 621, 624 (2d Cir.1943).

As originally framed, the rule permitted entry of judgment on any single claim and compulsory counterclaim to that claim, if any, *see* 6 James Wm. Moore, *Moore's Federal Practice* ¶ 54.04[3.–4]; but since the 1938–1948 version of the rule did not require the clerk to enter a separate judgment, parties were frequently confused as to when the time for filing an appeal began to run. *E.g., Dickinson,* 338 U.S. at 517, 70 S.Ct. at 327 (Black, J., dissenting). To be safe, parties often filed "protective appeals" from orders ultimately held to be interlocutory by the court of appeals. *See, e.g., Rosenblum v. Dingfelder,* 111 F.2d

406, 407 (2d Cir.1940). *See also* 6 *Moore's Federal Practice* ¶ 54.04[3.–4].

To remedy this inefficiency and confusion, rule 54(b) was amended in 1946, effective 1948, in order to provide for the entry of a separate "judgment" by the clerk at the district judge's direction. *Dickinson,* 338 U.S. at 512, 70 S.Ct. at 324. The 1948 amendment also reduced the minimum judicial unit from "a particular claim and all counterclaims arising out of the transaction or occurrence which is the subject matter of the claim" to one or more, but less than all, of the claims in an action.

The rule was further amended in 1961 to allow the district court to direct entry of a partial final judgment when all of the claims against one or more, but less than all, of the *parties* in an action were resolved. *See generally* Fed.R.Civ.P. 54(b) advisory committee notes.

The notes of the advisory committee in relation to the 1946 amendment indicate that the purpose of allowing the entry of a rule 54(b) partial final judgment was "to afford a remedy in the infrequent harsh case". The committee, however, neglected to provide an example of such a case. Contrary to the Supreme Court's 1980 command that "the phrase 'infrequent harsh case' in isolation is neither workable nor entirely reliable as a benchmark for appellate review", *Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. at 1466, we have occasionally resurrected the phrase. *See, e.g., Cullen v. Margiotta,* 811 F.2d at 710 (quoting *Cullen v. Margiotta,* 618 F.2d 226, 228 (2d Cir.1980) (*per curiam*) (in turn quoting *Panichella v. Pennsylvania R. Co.,* 252 F.2d 452, 455 (3d Cir.1958) (in turn quoting Fed.R.Civ.P. 54 advisory committee's note to 1946 amendment))); *Harriscom Svenska AB v. Harris Corp.,* 947 F.2d 627, 629 (2d Cir.1991) (quoting *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 445 (2d Cir.1985) (in turn quoting *Panichella,* 252 F.2d at 455 (in turn quoting Fed. R.Civ.P. 54 advisory committee's note to 1946 amendment))). *But see Hudson River Sloop Clearwater, Inc.,* 891 F.2d at 419 (rejecting rubric of "infrequent harsh case").

The reason that "infrequent harsh case" is "neither workable nor entirely reliable as a benchmark for appellate review" is obvious: federal litigation has changed over the years, and what was "infrequent" in 1946 has become normal in 1992. We see this in the civil appeals that parade before us; the district courts within this circuit know this from their own dockets as well. For example, in 1946 this circuit heard *one* appeal involving rule 54(b); in 1991 we wrote *20* opinions on appeals or attempted appeals from judgments entered pursuant to the rule.

The liberal joinder provisions of the federal rules, *see, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) ("the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged"), have combined with a sharp increase in the number of federal statutes and court-declared rights, *see* Richard A. Posner, *The Federal Courts: Crisis and Reform* 80–81 (1985), to ensure that "[a] growing number of complex, potentially protracted cases make their way to [federal] court." Maurice Rosenberg, *Federal Rules of Civil Procedure in Action: Assessing Their Impact,* 137 U.Pa.L.Rev. 2197, 2199 (1989). "With the advent of industrialization, high-speed transportation, and urbanization, more intricate disputes appeared with greater frequency," requiring greater use of the more liberal joinder procedures. 6A Wright, Miller & Kane § 1581. We might well add asbestos litigation, *see, e.g., In re Joint Eastern & Southern Dists. Asbestos Litigation,* 891 F.2d 31, 33 (2d Cir.1989), other mass torts, *see, e.g., In re "Agent Orange" Prod. Liability Litigation,* 818 F.2d 145, 162–63 (2d Cir.1987) *and In re "Agent Orange" Prod. Liability Litigation,* 818 F.2d 179, 181 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647, 648 (1988), large bankruptcies, *see, e.g., In re Chateaugay Corp.,* 945 F.2d 1205, 1206 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992), and complicated banking litigation, *see, e.g., FDIC v. Bernstein,* 944 F.2d 101, 102 (2d

Cir.1991), to further extend the list of intricate disputes which now pepper the dockets of the district courts and cry out for flexibility in granting partial final judgments under rule 54(b).

The increased complexity of litigation is reflected not only in mega-cases; many of today's "simpler" civil cases, such as the one at bar, would have qualified as "infrequent" in 1946. For example, the only case decided by this court in 1946 which even touched on rule 54(b) involved one plaintiff, two defendants, one claim, and three distinct defenses. *Libbey–Owens–Ford Glass Co. v. Sylvania Indus. Corp.*, 154 F.2d 814 (2d Cir.), *cert. denied*, 328 U.S. 859, 66 S.Ct. 1353, 90 L.Ed. 1630 (1946) (dismissing attempted appeal from district court's striking of a defense).

In short, now that the garden-variety civil complaint often involves multiple claims and/or multiple parties, we cannot, as the Supreme Court has recognized, hide behind the old "infrequent harsh case" chestnut. Nor, for that matter, should we rely on any other comparative adjectives like "unusual", "exceptional", or "extraordinary" if we wish to chart a sound course for future panels of this court: today's "extraordinary" case may well be tomorrow's ordinary fare.

The proper guiding star, as the Supreme Court has emphasized, is "the interest of sound judicial administration". *Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1465; *Sears, Roebuck*, 351 U.S. at 437, 76 S.Ct. at 900. Sound judicial administration, however, cannot be confined to economy or efficiency in just the appellate court; if that were the standard, we should return to the common law's "one suit, one appeal" standard. Rather, sound judicial administration must involve a proper regard for the duties of both the district court and the appellate court. We should avoid the possibility that the ultimate dispositions of the claims remaining in the district court could either moot our decision on the appealed claim or require us to decide issues twice.

The Supreme Court has suggested that "inherently inseparable" claims are inappropriate for rule 54(b):

[I]t cannot well be argued that the claims stated in Counts I and II are so inherently inseparable from, or closely related to, those stated in Counts III and IV that the District Court has abused its discretion in certifying that there exists no just reason for delay. They certainly *can* be decided independently of each other.

*Sears, Roebuck*, 351 U.S. at 436, 76 S.Ct. at 900 (emphasis in original). Judge Friendly used the term "inextricably intertwined" to refer to the sort of claims so interrelated that (1) we would necessarily have to reach the merits of one or more of the claims not appealed and/or (2) the district court's disposition of one or more of the remaining claims could render our opinion advisory or moot. *See, e.g., Brunswick*, 582 F.2d at 184–85; *Western Geophysical Co. v. Bolt Assocs., Inc.*, 463 F.2d 101, 103 (2d Cir.), *cert. denied*, 409 U.S. 1040, 93 S.Ct. 523, 34 L.Ed.2d 489 (1972). But, Judge Friendly noted, if "on any resolution of the pending claim the court's determination of the appealed issue would stand and did not have to be made in the alternative", then we should hear the appeal. *Brunswick*, 582 F.2d at 185. *See SCM Corp. v. Radio Corp. of America*, 407 F.2d 166, 170 (2d Cir.), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969).

When we review the district court's decision to "dispatch", *see Sears, Roebuck*, 351 U.S. at 435, 76 S.Ct. at 899, a finally-decided claim or claims for appeal, we need to keep in mind, of course, that there is a continuum between "interrelated" and "inextricably intertwined". There is always an underlying interrelatedness of the claims between the parties in a multiparty civil action; rule 20(a) permits joinder only if the asserted claims for relief by and/or against the various parties are "in respect of or arising out of the same transaction, occurrence, or series of transactions and occurrences *and* if any question of law or fact common to all [plaintiffs or defendants] will arise in the action." However, this interrelatedness cannot, in itself, "inextricably intertwine" the claims so as to preclude appellate review; otherwise, every multiparty case (and virtually every

multiclaim case) would elude the entry of a rule 54(b) judgment, and rule 54(b) would be meaningless.

■ Only those claims "inherently inseparable" from or "inextricably interrelated" to each other are inappropriate for rule 54(b) certification. When the claims are "separable" or "extricable" from each other, there is generally no reason to disturb the district court's exercise of its discretion. We "scrutinize the district court's evaluation of such factors as the interrelationship of the claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units." *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. at 1466. Once we are satisfied that the claims are extricable from one another, we give the district court's discretionary judgment "substantial deference, for that court is 'the one most likely to be familiar with the case and with any justifiable reasons for delay.'" *Id.* (quoting *Sears, Roebuck*, 351 U.S. at 437, 76 S.Ct. at 900).

■ Applying these principles, we conclude that the district court properly exercised its discretion to dispatch Ginett's severance pay claim for appeal. Ginett's complaint, although structured in three counts, stated four claims for relief:

(A) that his termination without "just cause" violated CTG's written and oral policies, as well as New York *wrongful discharge* laws (count I);

(B) that he is entitled to all of the *deferred incentive compensation* for the UPI deal (count II);

(C) that he is entitled to *severance pay* under the 1988–92 compensation plan (also count II); and

(D) that he is entitled to damages for CTG's violation of *civil RICO* (count III).

The civil RICO claim, (D), has been dismissed by the district court. Still remaining for decision in the district court are claims (A) and (B), neither of which involves severance pay. In deciding (C), the claim for severance pay, which is due to Ginett regardless of the reasons for his termination, the district court necessarily disposed of these issues:

(1) the 1988–92 compensation plan is supported by consideration;

(2) the 1988–92 plan is not dependent on an unfulfilled condition precedent; thus

(3) it is a valid agreement which by its terms makes liability for severance pay conditional on the occurrence of either of two events: Ginett's termination or resignation.

(4) Ginett was terminated;

(5) Ginett is entitled to four months' severance, "based upon the average of the last three months['] total compensation (i.e. Ginett shall receive 1.33 times the prior quarter['s] total compensation)";

(6) the term "total compensation" is unambiguous;

(7) "total compensation" includes base salary, deferred incentive compensation, and other incentive compensation;

(8) During the quarter preceding his termination, Ginett had received $24,000 in base salary, $80,000 in deferred incentive compensation, and no other incentive compensation;

(9) his "total compensation" during the prior quarter was $104,000;

(10) multiplying $104,000 by 1.33 yields CTG's liability for severance pay, namely $138,320; and

(11) prejudgment interest should run from December 1, 1988.

While only issues (4) and (8) are not in dispute on this appeal, resolution of none of these 11 issues is dependent on what happens to the claims remaining in the district court.

In deciding claim (A), wrongful termination/breach of contract, the district court will have to determine whether employee handbooks and oral promises created a "just cause" standard of termination, and, if so, whether that standard was breached when CTG terminated Ginett. The district court's conclusions on those issues, whatever they may be, will create no risk of entanglement with any decision we might now make, because we will not be deciding any more of the case than the claim for severance pay, which was due on termi-

nation, whether it was with or without just cause. Thus, the district court need not address any issue, in the course of deciding the remaining claims, which could moot or force us to duplicate our decisionmaking. In short, the issues which make up the severance pay claim are separable from the issues which make up claim (A) for wrongful discharge. "They certainly can be decided independently of each other." *Sears, Roebuck,* 351 U.S. at 436, 76 S.Ct. at 900.

Similarly, in deciding claim (B) the district court will be interpreting the August 15, 1988 deferred compensation agreement, and Ginett's post-termination rights under that agreement (*i.e.,* can Ginett, taking into account section 1.02, sue for the unpaid incentive compensation from the UPI deal?). The issue before the district court involves the unpaid incentive compensation from the UPI deal; the case at bar involves the incentive compensation already paid to the trust. Clearly, any decision the district court makes on Ginett's deferred incentive compensation claim will have no impact on the appealed severance pay claim. In short, we will not on this appeal be deciding any issues which remain for decision in the district court, and nothing the district court can later do on the remaining two claims can alter our decision today.

Judge Elfvin reached all of the conclusions regarding relatedness that we do, and added that further delay would work an undue hardship on Ginett, as he was fired over three years ago and has yet to receive any of the severance pay to which he was entitled in 1988. All of these conclusions are "juridically sound and supported by the record." *Curtiss-Wright,* 446 U.S. at 10, 100 S.Ct. at 1466. Indeed, we have recognized that one of the objectives of severance pay is "to protect employees from the economic hardship of joblessness". *Bradwell v. GAF Corp.,* 954 F.2d 798, 801 (2d Cir.1992). If Ginett is legally entitled to a judgment on his severance pay claim, he should be able to execute upon it now, and should not be penalized for combining his separate claims against CTG in one complaint. This is exactly the sort of "hardship and denial of justice through delay" that rule 54(b) was designed to eliminate.

*See Dickinson,* 338 U.S. at 511, 70 S.Ct. at 324.

Our conclusion is further supported by the wisdom of the seventh circuit in *Local P-171 v. Thompson Farms Co.,* 642 F.2d 1065, 1075–77 (1981), which held appealable a 54(b) judgment awarding vacation pay to employees under a collective bargaining agreement even though other employment-contract-related claims were still under the aegis of the district court. For our purposes, that situation is indistinguishable from the case at bar.

In sum on the jurisdictional point, the district court's severance pay decision was a final decision on one of the four claims presented to the district court. The claim for severance pay was separable from and independent of the rest of the claims in the case; accordingly, the court did not abuse its discretion in directing entry of a final judgment under rule 54(b). We move on to the merits of CTG's appeal.

### III. MERITS

In reviewing the district court's decision to grant summary judgment on the severance pay claim, we apply the familiar standard of *de novo* review, inquiring whether there is a "genuine issue as to any material fact", Fed.R.Civ.P. 56(c), such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This means that we look at the contract *de novo* to determine whether or not there exists an ambiguity; if not, then summary judgment was proper. If an ambiguity in the contract exists, then summary judgment is generally improper, because the principles governing summary judgment "require that where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting". *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983).

### A. *CTG's liability for severance pay.*

CTG initially argues that Ginett is entitled to no severance pay, because (a) the

1988–92 compensation plan is separable into two contracts—page one (containing "compensation" terms) and page two (containing severance, non-compete, and other terms)—and since all agree that Ginett did not sign a new non-compete agreement, the severance pay portion of the 1988–92 compensation plan is unenforceable due to a failure of consideration; and (b) alternatively, the failure to sign a new non-compete agreement constitutes an unfulfilled condition precedent of the 1988–92 plan, thus excusing CTG's non-performance.

■ Generally, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents. RESTATEMENT (SECOND) OF CONTRACTS § 240. *See, e.g., Christian v. Christian*, 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 365 N.E.2d 849 (1977); II E. Allan Farnsworth, *Contracts* § 8.13 (1990) (Farnsworth). CTG correctly cites the leading New York cases on severability of contracts, *e.g., Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) ("In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances"), but goes on to apply this standard in a strained fashion. We thus reject CTG's claims that the severance pay provision is unenforceable.

■ CTG wishes us to pair up the promise to sign a new non-compete with the promise to pay severance pay upon termination and treat them as "agreed equivalents". The "intent manifested", says CTG, is found by comparing page one of the 1988–92 plan with page two. Page one, which CTG renames "the compensation section", is "concerned with the compensation Ginett would receive for his services as an employee." Page two, renamed in CTG's brief as "the severance section", "is concerned with Ginett's severance compensation and his execution of a new non-compete agreement." CTG also points us to the presence of a "block letter disclaimer" at the top of page two which "divides the agreement into two separate sections."

CTG further suggests that if this overwhelming proof of "intent manifested" is not enough for us to conclude that the agreement is separable, it at the very least creates an ambiguity which entitles CTG to introduce extrinsic evidence of "surrounding circumstances". The extrinsic evidence was proffered to the district court through the affidavit of Stephen P. Keider; not surprisingly, it sought to explain how vital the new non-compete agreement was to the negotiation of the 1988–92 compensation plan:

> In negotiating the terms of Mr. Ginett's 1988 compensation agreement it was the desire of your deponent to have Mr. Ginett execute a new non-compete agreement as part of his compensation agreement. I was dissatisfied with the scope of the original non-compete which Mr. Ginett had signed when he joined the Company in September of 1985. * * * I wanted considerably more protection for CTG in the event Mr. Ginett left the Company's employ than that afforded in the September 1985 non-compete agreement. * * *

> \*   \*   \*   \*   \*   \*

> The execution of a new non-compete agreement as part of the March 17, 1988 compensation agreement was a material provision of the agreement specifically negotiated between myself and Mr. Ginett. If Mr. Ginett had not agreed to enter into a new non-competition agreement with CTG I would not have signed off on Mr. Ginett's 1988 compensation plan.

Regardless of what CTG's affiant now says he then thought, it would be an unreasonable reading of the 1988–92 compensation plan to read it as a divisible contract. CTG's argument boils down to "page one should be treated as one contract, page two as another". But everything in the agreement points to a construction of the 1988–92 plan as a unified, inseparable whole. While form is not conclusive, the fact that the parties entered into only one agreement encompassing numerous terms rather than

two agreements is "influential". *Compare Rudman*, 30 N.Y.2d at 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (separate agreements involving separate parties makes "the conclusion of separateness * * * all but inescapable"). All references to the compensation plan utilize singular nouns and pronouns ("this agreement", "This plan"). There is no express severability clause, *compare Christian*, 42 N.Y.2d at 73, 396 N.Y.S.2d 817, 365 N.E.2d 849 (citing 5 *Williston on Contracts* § 767 (3d ed. 1961)), no obvious unit-for-unit transaction, *compare British Films Do Brasil v. London Film Prods., Inc.*, 8 Misc.2d 848, 166 N.Y.S.2d 703, 705 (N.Y.Sup.Ct.) ("since there were 23 pictures involved, and royalty payment of $23,000 made, it seems that the rate was $1,000 each"), *appeal dismissed*, 4 A.D.2d 858, 170 N.Y.S.2d 486 (1st Dept.1957), and no way to determine the agreed-upon consideration for each part of the contract. "We would, in short, be writing a new contract for these people if we broke this single promise up into separate deals; and the new contract so written by us might be, for all we know, most unjust to one or the other party." *New Era Homes Corp. v. Forster*, 299 N.Y. 303, 306, 86 N.E.2d 757 (1949).

The affidavit offered by CTG smacks of *post hoc* lawyering: the most obvious reason for dividing the agreement into two pages was that page one was full. Everything within this document points to the conclusion that the parties intended it to be single and inseparable; mere argument that the agreement can be "mathematically" parcelled out (which any multi-line or multi-page document may be) does not open the door to extrinsic evidence which would alter the clear import of the written agreement. *See, e.g., In re United Network, Inc.*, 459 F.2d 556, 562 (2d Cir.), *cert. denied*, 409 U.S. 916, 93 S.Ct. 238, 34 L.Ed.2d 178 (1972). Moreover, as the aforementioned affidavit implies, the 1985 non-competition agreement is still in effect. That agreement reads, in its entirety:

> I agree, while employed by Computer Task Group and for six (6) months after such employment ends, I will not perform within any Computer Task Group accounts similar or identical duties for any of Computer Task Group's current or future competitors. Also, I will not solicit, recruit, or hire any of Computer Task Group's employees to work for anyone other than Computer Task Group. Nor will I disclose any employee or customer lists, trade secrets, proprietary software program, or any other company proprietary information obtained by me as a result of being employed by Computer Task Group to anyone except in the ordinary course of conducting business for Computer Task Group's benefit.

Although CTG's vice-president says he was "dissatisfied with the scope of" this agreement and wanted "considerably more protection for CTG", CTG does not suggest, via affidavit or argument, what new, larger scope they hoped for. Indeed, given New York's strong disfavor of non-competition covenants in employment contracts, *see, e.g., Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976), it is hard for us to see that much "more protection" or wider scope was available without violating public policy.

Despite CTG's after-the-fact assertions that this term was vital to the 1988–92 compensation plan, the term is buried in the middle of page two, the specifics of the new non-compete were left open, and—if we were to consider CTG's extrinsic evidence—the parties "agreed to defer the drawing and execution of the [non-compete] agreement" until after completion of the protracted negotiations leading up to the deferred compensation agreement. Clearly, the non-compete provision became essential only in litigation, and not at the time the contract was signed.

■ Finally, our review of the contract reveals no "conditional" language or any other indication that the signing of the non-compete agreement was a condition precedent to anything. A "condition" is "an event that must occur *before* performance of a contractual duty becomes due." II Farnsworth § 8.1 (emphasis added). Conditions are not favored under New York law, and in the absence of unambiguous

language, a condition will not be read into the agreement. *Uniroyal, Inc. v. Heller,* 65 F.R.D. 83, 93 (S.D.N.Y.1974). *See also* 5 *Williston on Contracts* § 665; RESTATEMENT (SECOND) OF CONTRACTS § 224. "Parties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition, but other words may suffice." II Farnsworth § 8.2; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 226 comment a. In contrast, here, there is no such language which, even straining, we could read as imposing a condition.

We thus conclude that there is no interpretation of the 1988–92 compensation plan which would allow CTG to escape liability for paying severance pay to Ginett.

## B. *Calculation of severance pay.*

■ Having concluded that the district court correctly determined that Ginett was entitled to summary judgment for severance pay, we move on to determine whether there is any genuine issue of material fact undermining the district court's conclusion that the amount Ginett was entitled to is $138,320. We conclude that there is and therefore we reverse the district court's judgment and remand for trial on the limited issue of the amount of severance pay due Ginett.

Under the 1988–92 compensation plan, Ginett is entitled to

> four month's [*sic*] severance, based upon the average of the last three months['] total compensation. (i.e. Ginett shall receive 1.33 times the prior quarter['s] total compensation).

The district court concluded that the term "total compensation" was unambiguous, and included (1) base salary, (2) deferred incentive compensation, and (3) other incentive compensation.

CTG argues that the term "total compensation" is ambiguous, since "total" is used only in the severance pay provision and nowhere else. More specifically, CTG claims that extrinsic evidence would show that the "total compensation" upon which Ginett's severance pay was based included only Ginett's base salary and incentive

compensation, but not his deferred incentive compensation; thus, CTG argues, the severance pay award should only have been $31,920 ($24,000 in base salary and zero other incentive compensation for the prior quarter, times 1.33).

On this point, we disagree. The 1988–92 plan states that Ginett's "compensation is composed of the following: * * * Base Salary * * * [,] Deferred Incentive Compensation * * * [and] Other incentive". (underscoring in original). CTG's argument, that the addition of the word "total" to "compensation" renders the term "total compensation" ambiguous, is frivolous. "Total" has a common meaning, and since the agreement provides that Ginett's "compensation" was composed of the three elements listed above, Ginett's "total compensation" must necessarily be the total of all three elements, not only the first and the third. Thus, Judge Elfvin did not err in concluding that Ginett's "total compensation" included his base salary, deferred incentive compensation, and other incentive compensation.

That does not end our inquiry, because there is an ambiguity in the 1988–92 plan's method for calculating severance pay; this ambiguity is, however, limited merely to the mathematical calculations. There is no dispute that the 1988–92 compensation plan, as described in Ginett's memo of March 17, 1986, contemplated that deferred incentive compensation was to be paid quarterly. There is similarly no dispute that the deferred compensation agreement, which was executed to carry out the plan, did not call for *quarterly* installments; rather, it provided that the first installment was to be an *annual* installment of $80,000. This was paid on November 3, 1988. Further installments were to be paid in *semiannual* installments of $40,000 each, but Ginett was terminated before any of the additional installments became due.

The district court concluded that the entire $80,000 that was paid on November 3, 1988 was to be included within "the last three months['] total compensation." While that is one reasonable reading of the documents, nevertheless, it would be at

least as reasonable to read the 1988–92 plan as contemplating the calculation of severance pay based only upon one, quarterly, $20,000 installment of deferred incentive compensation. This alternate, reasonable reading of the severance pay provision would allow Ginett severance pay of only $58,520 ($24,000 of base salary, plus $20,000 in deferred incentive compensation, plus zero other incentive compensation, times 1.33). We think a trial is necessary to resolve the conflict and to determine which interpretation was truly intended by the parties.

### C. *Prejudgment interest.*

■ Finally, CTG challenges the district court's decision to award Ginett prejudgment interest running from December 1, 1988. This court has consistently held that, in diversity cases commenced under New York law, the source of the right to prejudgment interest is N.Y.Civ.Prac.L. & R. § 5001 (McKinney 1963). *See, e.g., F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1261 (2d Cir.1987). Section 5001(a) provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract", § 5001(b) states that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed", and § 5001(c) provides that the date from which interest is to be computed is a question of fact, generally to be determined by a jury, but also determinable by "the court upon motion".

CTG argues that "[w]hile the agreement recites the event of termination as the basis for payment of severance compensation, it does not state when the severance compensation must be paid." Since no demand for the severance was made by Ginett, CTG argues that the date of the lawsuit's filing is the earliest date that can be fixed for the computation of interest.

We disagree. Prejudgment interest was properly computed from December 1, 1988. It bears repeating that one of the principal aims of severance pay is "to protect employees from the economic hardship of joblessness", *Bradwell v. GAF Corp.*, 954

F.2d at 801, and prejudgment interest has a similar aim—to protect plaintiffs from the economic hardship of delay. *Cf. Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 833–35 (2d Cir.1992). "Severance" pay, by its very name, implies payment upon severance, and the policies behind severance pay would not be served if payment could be delayed as it was here. We see no other reasonable reading; consequently, Ginett was not required to make a demand in order to start the clock on prejudgment interest. Rather, interest is to be computed from "the earliest ascertainable date the cause of action existed", and Ginett's cause of action to recover severance pay existed, without doubt, on the day that he was terminated.

### IV. CONCLUSION

Partial final judgment on the claim for severance pay was properly entered pursuant to rule 54(b); consequently, we have appellate jurisdiction over that claim. We agree with the district court that CTG is liable to Ginett for the payment of severance pay. However, we remand for a trial on the limited issue of the amount of deferred incentive compensation to be included in the calculation of severance pay.